NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0351n.06

Case No. 23-5123

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Aug 12, 2024
KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
|  | ) | |
|  | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
|  | ) | COURT FOR THE MIDDLE |
| MARVIN SHOULDERS, | ) | DISTRICT OF TENNESSEE |
|  | ) | |
| Defendant-Appellant. | ) | O P I N I O N |
|  | ) | |

BEFORE: SILER, COLE, and BUSH, Circuit Judges.

PER CURIAM. Marvin Shoulders was found guilty of conspiracy to distribute 50 grams or more of methamphetamine (Count One) and two counts of distributing 50 grams or more of methamphetamine (Counts Two and Three). On appeal Shoulders argues that: (1) there was insufficient evidence for his conspiracy conviction; (2) because there was insufficient evidence of conspiracy, he is entitled to a new trial on his drug distribution charges; (3) the government violated Shoulders's Due Process and Confrontation Clause rights by failing to produce a confidential informant (CI) as a witness at trial; and (4) the drug-related evidence submitted at trial did not have a valid chain of custody. For the following reasons, we affirm.

I.

This case arises from five "controlled buys," between August 2018 and January 2019, orchestrated by the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and multiple Tennessee law enforcement agencies, whereby Shoulders sold large quantities of

methamphetamine to a CI. (Order, R. 139, PageID 1376; Trial Tr., R. 118, PageID 656−59). The CI was compensated for his involvement, made phone calls to arrange each controlled buy, and his interactions with Shoulders were all video and audio recorded. (*Id.* at 656−58; Trial Transcript Two, R. 119, PageID 726−27, 745−47, 768−70, 784−85). Law enforcement surveilled the CI as he traveled to and from his exchanges with Shoulders. Two of the controlled buys occurred in Tennessee, and three occurred in Alabama.

The first controlled buy occurred on August 15, 2018. The CI was prepped by law enforcement in Tennessee,[1] called Shoulders to set up the transaction, then traveled to meet Shoulders at his apartment complex in Athens, Alabama. (Trial Tr., R. 118, PageID 664−69). The CI exited his vehicle upon arrival, but reentered the vehicle—now sitting in the front passenger seat—while Shoulders sat down in the driver's seat. Shoulders then drove the CI's vehicle to a gas station in Athens. (R. 119, PageID 709).

> At the gas station, a surveilling officer, Agent Jacob Donnelly, observed the following:
>
> I observed the informant's black four-door sedan parked in the parking lot. Several minutes after that, I observed a maroon-in-color sedan park next to the informant's vehicle . . . Shortly after that, I remember a male exiting the driver's side . . . of the informant's vehicle, and walking towards the front entrance of the Vulcan gas station . . . I watched him walk to the front door with another male . . . The informant remained inside the vehicle.

(*Id.* at PageID 711−12). Shoulders exited the gas station shortly thereafter, reentered the vehicle, and drove back to his apartment with the CI. He sold the CI approximately two ounces of methamphetamine outside of the apartment. The informant then drove directly to meet law enforcement to surrender the purchased drugs.

---

[1] Before each controlled buy, law enforcement met with the CI at a "staging location" in Tennessee to provide him with funds and place a "button camera" on his person. (*See e.g.,* R. 118, 659, 660−62). Law enforcement also equipped the informant's vehicle with a camera for the last four controlled buys. (*See e.g.,* R. 119, PageID 726−28).

Law enforcement also collected video and audio recordings of Shoulders's statements to the CI. Shoulders, for example, explained why they were traveling to the gas station, stating:

> Shoulders: I'm fixing to pull up to the store here. I ain't got, I ain't had that s\*\*t at my mama's . . .
> CI: Oh, ok, ok.
> Shoulders: So I asked him . . .
> CI: . . . to meet you at the store. Yeah, ok.

(Ex. 4D, R. 118, 670−71, 676). Shoulders also made other statements during the drive to the gas station, including telling the informant that "I was supposed to go do this by myself . . .", and ". . . ain't had my people in position when you called me so I had to wait on them." (Ex. 4F, R. 119, PageID 712). Lastly, he said that "[n]ext time it won't be like this." (*Id.*)

The second controlled buy occurred on October 3, 2018. The CI was first prepped by law enforcement in Tennessee then drove to Shoulders's apartment in Athens, Alabama. Video shows Shoulders handing the CI methamphetamine in exchange for cash. (Exs. 10−11, R. 119, PageID 737−38). After the exchange, Shoulders told the CI that the methamphetamine prices "might get cheaper." (Ex. 10D, R. 119, PageID 735). In that case, Shoulders cautioned that the CI would "need [to] get it cheaper for [another purchaser] too . . . so we can keep him coming." (*Id.*). The CI again drove directly to a location designated by law enforcement after the controlled buy, where he gave Agent Donnelly 84.1 grams of methamphetamine.

The next two controlled buys occurred on November 1 and November 15, 2018 in the parking lot of a Burger King restaurant in Ardmore, Tennessee. (R. 119, PageID 752−76, 779−81). The final controlled buy occurred on January 8, 2019, at the same apartment complex in Alabama. The CI met Shoulders, they exchanged cash for large quantities of methamphetamine, and the CI

met with law enforcement immediately after to surrender the drugs.  The last three controlled buys were also recorded.

## II.

Shoulders was indicted by a federal grand jury for: (i) conspiracy to knowingly and intentionally distribute and possess with the intent to distribute 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 846 (Count One); and (ii) two counts of knowingly and intentionally possessing with the intent to distribute and distributing 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), on the basis of the November 1 and November 15, 2018 controlled buys, respectively (Counts Two and Three).

## A.

Shoulders filed two pretrial motions that are relevant to this appeal.  First, Shoulders moved to dismiss the indictment.  Among other arguments, as to his conspiracy charge (Count One), he argued that an agreement made solely between him and the CI was not sufficient to establish a conspiracy.  (Motion to Dismiss, R. 66, PageID 194−95 (citing *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984)).  The district court denied the motion in full.

Next, after learning that the government did not intend to produce the CI as a witness at trial, Shoulders also filed a motion in limine to compel the government to disclose the CI's identity, criminal history, and "[a]ny interviews, memorandum of interview[s], or other materials reflecting statements made by the [CI]."  (Motion, R. 67, PageID 197−98).  The government opposed the motion.  (Response, R. 84, PageID 347−48).

While Shoulders's motion was pending, however, his counsel represented to the court that "Mr. Shoulders knows the identity of the informant," and that he thought the parties "resolved [the] . . . informant issue."  (Conference Tr., R. 131, PageID 1299).  Shoulders's counsel noted

that he was "more concerned with [] the . . . deal the informant got. [And] [t]he government has agreed to provide that information." (*Id.*) As a result, Shoulders's motion was "resolved" by the parties.

B.

Trial commenced in November 2021. The jury watched portions of the video recordings and listened to various conversations between Shoulders and the CI during the controlled buys. (R. 118, PageID 670; R. 119, PageID 735−36, 755−65, 772, 787). The government produced multiple law enforcement witnesses to testify about the chain of custody of the methamphetamine that Shoulders sold the CI. The government, through the chemist who lab-tested the drugs, admitted five separate bags of methamphetamine as evidence. Through Agent Donnelly, the government admitted photos of the same methamphetamine taken prior to its submission to the drug-testing lab. Donnelly explained that he took possession of the methamphetamine after four of the five controlled purchases, and he also explained the chain of custody protocol. Shoulders did not object to the admission of this evidence.

Shoulders's counsel criticized the government for not producing the CI as a witness. He cross-examined Donnelly about the CI's background, criminal history, and payment for acting as a CI. He highlighted the CI's absence, stating that it was "the big elephant in the room" and that the CI was "a violent felon," "a thief," "a drug trafficker," and "probably not in jail right now because he's a snitch." (R. 120, PageID 1121−22).

C.

After the government rested, Shoulders moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a), challenging the conspiracy charge. He argued that: (1) there was insufficient evidence to support the conspiracy charge, (2) the government's failure

to produce the CI violated Shoulders's Due Process and Confrontation Clause rights, and (3) the indictment should be dismissed because the chain of custody as to the methamphetamine was insufficient. (R. 120, PageID 1081−86). The district court reserved its decision until after trial. On November 19, 2021, the jury found Shoulders guilty on all three counts. Shoulders renewed his Rule 29 motion. The district court denied it, and this appeal followed.

### III.

Shoulders first argues that the district court should have granted his Rule 29 motion for judgment of acquittal because there was insufficient evidence to support his conspiracy conviction under § 846 (Count One). Shoulders submits that the government only produced evidence showing a conspiracy between him and the CI, but that the government did not identify any other "co-conspirator[s], [] agreement, or [] criminal objective." (Appellant Br. at 8). We disagree.

### A.

We review de novo a district court's denial of a Rule 29 motion for judgment of acquittal. *United States v. Kone*, 307 F.3d 430, 433 (6th Cir. 2002). The standard that Shoulders must satisfy to prevail on his insufficiency claim is a "demanding" one: he must show "that no rational jury could have found the essential elements of a conspiracy beyond a reasonable doubt." *United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021). Evidence supporting his conviction can be "direct or circumstantial," and "[i]t is not necessary that circumstantial evidence remove every reasonable hypothesis except that of guilt." *Kone*, 307 F.3d at 434 (brackets omitted). "We can neither independently weigh the evidence, nor make our own assessment of the credibility of the [testifying] witnesses." *United States v. Garcia*, 758 F.3d 714, 718 (6th Cir. 2014).

"[T]he issue here . . . poses the 'legal' question [of] whether the conduct the jury could reasonably have found to have occurred amounts to a conspiracy." *Wheat*, 988 F.3d at 306

(citation omitted). To prove a drug conspiracy, the government must "show that two or more individuals have agreed to violate a drug law . . . and that the defendant knowingly and voluntarily entered into this agreement." *Id.* This is because "the essence of [conspiracy] is an agreement to commit an unlawful act." *Id.* at 306–07 (citation omitted) (explaining that "[a] defendant's speech or conduct must show that a defendant knew of the agreement's essential object, even if not the details, and agreed to carry out that object" (cleaned up)).

"[A]n agreement between a defendant and a government agent or informer will not support a conspiracy conviction." *Pennell*, 737 F.2d at 536. A defendant's communications with "a government agent," however, can "establish the existence of a conspiracy between the defendant and other, non-government co-conspirators." *United States v. Cordero*, 973 F.3d 603, 617 (6th Cir. 2020).

In addition, we have long interpreted the drug-conspiracy statute, 21 U.S.C. § 846, to explicitly prohibit finding a conspiracy where only two individuals "knowingly reach[ed] an agreement to distribute drugs." *Wheat*, 988 F.3d at 304 (citing *United States v. Potter*, 927 F.3d 446, 453 (6th Cir. 2019)). In other words, a buyer-seller agreement alone does not amount to a conspiracy. *See United States v. Hamm*, 952 F.3d 728, 736 (6th Cir. 2020) (stating "[t]he buy-sell transaction is simply not probative of an agreement to join together and accomplish a criminal objective beyond that already being accomplished by the transaction" (citation omitted)). The opposite "conclusion would turn every drug deal into a drug conspiracy." *Wheat*, 988 F.3d at 304. We consider the following factors when deciding if a buyer-seller agreement forms "part of a larger drug conspiracy": "evidence of advanced planning; multiple transactions involving large quantities of drugs; repeat purchases . . . or other enduring arrangements; the length of the relationship; the established method of payment; the extent to which transactions are standardized; and the level of

mutual trust between the buyer and the seller." *Hamm*, 952 F.3d at 736 (internal quotation marks and citation omitted).

B.

The government presented enough evidence from which the jury could infer that Shoulders and an unnamed co-conspirator participated in a "broader agreement" to distribute drugs to third parties. *Wheat*, 988 F.3d at 304. Consider the facts before the jury: ATF Agent Donnelly testified that in August 2018, he observed Shoulders and a CI drive from Shoulders's apartment to meet an unnamed third individual at a gas station before Shoulders sold the CI two ounces of methamphetamine. On the way to the gas station, Shoulders told the CI that he had to meet the unnamed individual because he did not have enough methamphetamine at his apartment. Shoulders and the individual entered the gas station at the same time, and Shoulders left a short time later. During the drive back to the apartment, Shoulders again explained to the CI that he "was supposed to go [to the gas station] by [him]self," and that he had to make the trip because he "ain't had [his] people in position when [the CI] called [him]." (R. 119, PageID 712.) Shoulders "had to wait on" his people so that he could replenish his stock of drugs and fill the CI's request. (*Id*.)

Shoulders referred to an unnamed third party again when he sold the CI approximately 84 grams of methamphetamine in October 2018. He explained to the CI that the drugs "might get cheaper," in which case the CI would "need [to] get it cheaper for him too . . . so we can keep him coming." (*Id.*, PageID 735). Shoulders sold methamphetamine to the CI on three separate occasions after the October 2018 purchase: he sold approximately 84 grams on November 1, 2018; 82 grams on November 15, 2018; and 28 grams on January 8, 2019.

Based on that evidence, a reasonable juror could convict Shoulders for conspiring to distribute drugs. Shoulders drove with the CI to a gas station, met an unnamed individual at that gas station, and immediately after their meeting, sold methamphetamine to the CI. By itself, that evidence shows—at most—a buyer-seller interaction between Shoulders and this individual, which is insufficient to show a conspiracy. But the jury considered additional evidence of a broader agreement. In addition to Shoulders's gas station meeting, the jury heard statements from Shoulders suggesting that he had had worked with third parties before: he referred to his "people," and he directed the CI to "get it cheaper for him too" when the two discussed purchasing drugs at a lower price. Those statements suggest an "enduring arrangement" between Shoulders and other individuals, which is enough to support the jury's verdict. *Hamm*, 952 F.3d at 736.

The jury also considered evidence that Shoulders purchased large amounts of drugs on multiple occasions. Circumstantial evidence of "repeated purchases, or evidence of a large quantity of drugs," can support a conspiracy conviction. *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006); *see also Wheat*, 988 F.3d at 308 (holding that evidence of purchases of large amounts of drugs "allow[s] a jury to conclude that the buyer and seller have reached a tacit agreement for the buyer to resell the drugs to downstream customers"). Here, although Shoulders sold only two ounces of methamphetamine to the CI during the first controlled buy, his next transactions involved approximately 84.1, 84, 82, and 28 grams of methamphetamine. At trial, a DEA witnesses testified that those amounts are consistent with distribution, rather than with personal use. The jury could have considered the amount of drugs involved in those transactions, along with Shoulders's statements alluding to longstanding relationships with suppliers and his visit to the gas station, to conclude that he participated in a conspiracy.

Comparing this case to *United States v. Wheat*, in which another panel of this court found insufficient evidence to support a conspiracy conviction, confirms our conclusion. 988 F.3d at 308. In *Wheat*, the defendant gave a ".3 gram free 'sample' of heroin" to a dealer, but his one-time gift "led to no further exchanges between [Wheat and the dealer]." *Id.* at 306. The court found that evidence of the sampler could show that Wheat and the dealer were considering whether to enter into a drug conspiracy, but that the government "identifie[d] 'nothing but speculation' that the parties ever passed this negotiations phase." *Id.* at 310 (citing *United States v. Ledbetter*, 929 F.3d 338, 359 (6th Cir. 2019)).

Admittedly, like in *Wheat*, the jury heard no direct evidence revealing the nature of Shoulders's agreements with other members of the conspiracy. Nor is it clear that when Shoulders mentioned his "people," he was referring to the individual he met at the gas station. But here, unlike in *Wheat*, the jury saw evidence that Shoulders repeatedly purchased distribution-level amounts of methamphetamine from a third party, and that he used the same "people" to obtain those drugs. That evidence distances this case from the "mere negotiations" context on display in *Wheat*, and instead suggests that Shoulders had reached a broader agreement with suppliers to resell the drugs he purchased. *United States v. Pennell*, 737 F.2d at 536.

It was not unreasonable for the jury to infer from Shoulders's statements about his "people," his visit to the gas station preceding his sale to the CI, and his purchasing history that he had entered into a drug conspiracy. Because of that evidence, viewed in light of our deferential review of a jury's verdict, we affirm the district court's denial of the motion for judgment of acquittal as to Count One.[2]

---

[2] Shoulders claims that if we vacate his conviction on Count One, he is entitled to a new trial on Counts Two and Three, the latter two distribution charges. He claims that the three charges were misjoined because evidence from the

IV.

Shoulders next argues that the district court violated his Due Process and Confrontation Clause rights by: (1) not requiring the government to produce the CI as a witness at trial, and (2) by admitting the conversations between Shoulders and the CI into evidence. (Appellant Br. at 33).

As to his Due Process argument, Shoulders filed a motion in limine to compel the government to disclose the informant's identity, but later Shoulders's counsel represented to the district court that he knew "the identity of the informant" and that he thought the parties "resolved [the] . . . informant issue." (R.67, PageID 197−98; R. 131, PageID 1299). Plainly, Shoulders waived this issue, and it is no longer before us. *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) ("Waiver is the intentional relinquishment or abandonment of a known right, and these rights are not reviewable") (citation omitted).

Shoulder's Confrontation Clause claim also fails. Shoulders did not object to the introduction of the CI's conversations with him on Confrontation Clause grounds at trial, so we review for plain error. *United States v. Ford*, 761 F.3d 641, 652 (6th Cir. 2014). "[T]o establish a Confrontation Clause claim," Shoulders must show that certain statements made by the CI are testimonial and that the government "used [the] out-of-court statement [at trial] for its truth." *United States v. King*, 865 F.3d 848, 850–51 (6th Cir. 2017). Shoulders did not identify, however, any statements made by the CI that he thought should have been precluded from evidence. *See id.* at 851; (*See* Appellant Br. at 37−39). We find no plain error as a result.

---

conspiracy charge unfairly prejudiced the jury as to the distribution charges. Because we affirm his conviction on all counts, we do not address his misjoinder claim.

V.

Lastly, Shoulders argues that "[t]he chain of custody of the drugs in evidence was so lacking as to call into question the jury's compliance with the instructions and its finding of guilt beyond a reasonable doubt." (Appellant Br. at 39). The parties argue over what procedural mechanism and standard of review Shoulders should have used to bring this claim. (*See* Appellee Br. at 51−52). If it is a Rule 29 motion for a judgment of acquittal, then we must determine whether a rational juror could have found the essential elements of the crime beyond a reasonable doubt. *See United States v. Crump*, 65 F.4th 287, 294 (6th Cir. 2023). Because he raises the argument for the first time on appeal, if Shoulders's claim is instead for juror misconduct, we review under the very deferential plain error standard of review. *United States v. Davis*, 306 F.3d 398, 418 (6th Cir. 2002).

Shoulders's claim fails under either standard of review. "Chain of custody issues are jury questions and the possibility of a break in the chain of custody of evidence goes to the weight of the evidence, not its admissibility." *United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010) (citation omitted). As such, physical evidence is admissible if "the possibilities of misidentification or alteration are 'eliminated, not absolutely, but as a matter of reasonable probability.'" *Id.* (quoting *United States v. McFadden*, 458 F.2d 440, 441 (6th Cir. 1972)). To demonstrate a break in the chain of evidence, Shoulders "must do more than merely raise the possibility of tampering or misidentification to render evidence inadmissible." *United States v. Knowles*, 623 F.3d 381, 386 (6th Cir. 2010). When "there is no evidence indicating that tampering . . . occurred, courts presume public officers have discharged their duties properly." *Id.*

At most, Shoulders's allegations "merely raise the possibility of tampering." *Allen*, 619 F.3d at 525. As the district court noted, "[t]he [g]overnment presented multiple witnesses at trial

who tracked the chain of custody of the narcotics," and the "jury was aware of Mr. Shoulder[s]'s contentions regarding the custody when it rendered a unanimous" guilty verdict. (R. 139, PageID 1381). The jury watched video evidence of Shoulders selling large quantities of methamphetamine to the CI on five separate occasions. And given the numerous law enforcement officers at trial who testified specifically to the custody issue, we agree with the district court that "a rational juror could conclude from the totality of the evidence presented at trial that the drugs analyzed by the DEA were the same drugs Mr. Shoulders sold to the" CI. (*Id.*)

## VI.

For the foregoing reasons, we affirm the judgment of the district court.