RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 08a0402p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

UNITED STATES OF AMERICA,

　　　　　　*Plaintiff-Appellee,*

　　*v.*

BILLY ED KEMP,

　　　　　　*Defendant-Appellant.*

No. 07-5837

>

─────────────

Appeal from the United States District Court
for the Western District of Tennessee at Jackson.
No. 05-10090—James D. Todd, District Judge.

Submitted: October 30, 2008

Decided and Filed: November 14, 2008

Before: MARTIN, DAUGHTREY, and KETHLEDGE, Circuit Judges.

─────────────

**COUNSEL**

**ON BRIEF:** April Rose Goode, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Memphis, Tennessee, for Appellant. James Wright Powell, ASSISTANT UNITED STATES ATTORNEY, Jackson, Tennessee, for Appellee.

─────────────

**OPINION**

─────────────

KETHLEDGE, Circuit Judge. Defendant Billy Ed Kemp appeals his conviction for being a felon in possession of a firearm. He argues that the district court erred in admitting evidence of his prior convictions, and in failing to instruct the jury on his justification defense. We affirm.

I.

Kemp was arrested in May 2005 with a .32 caliber derringer pistol in his pocket. He previously had been convicted of several felonies, including two for taking indecent liberties with a minor. Kemp was charged with being a felon in possession of a firearm that had traveled in interstate commerce, in violation of 18 U.S.C. § 922(g)(1).

Kemp did not contest any of the elements of this offense at trial. He stipulated to his status as a felon, pursuant to *Old Chief v. United States*, 519 U.S. 172 (1997). He also admitted that he possessed the gun, and did not dispute that it had traveled in interstate commerce. Kemp's sole

defense, instead, was that his possession of the gun was justified because he had taken it from an intoxicated friend who might harm herself or others.

Kemp's version of the relevant events, as set forth in his testimony at trial, was as follows. He testified that, on the night of his arrest, he was driving from Mississippi to Huntingdon, Tennessee, to visit his brother in the hospital. Cheryl Pigg, a friend who was staying at his house, joined him on the trip. A week before, Kemp had encouraged Pigg to purchase a gun to protect herself from her ex-husband, who allegedly had threatened to kill her. She took Kemp's advice, purchasing the derringer, and then brought it with her on the trip to Tennessee. Pigg also brought along a six-pack of "strawberry daiquiris," of which, according to Kemp, she had consumed "one and a half" before arriving at the hospital. Kemp says that she was intoxicated by then, and that he himself had taken a "double-dose" of Xanax on the trip. Upon arriving at the hospital, Kemp told Pigg that she could not bring the gun inside. As a result, she put the gun in the console of Kemp's pickup truck. On their way out of the hospital 45 minutes later, Kemp "noticed [Pigg] was kind of stumbling, and she went to running her mouth a little bit, talking funny." When they got back to the truck, "she was just giggling and carrying on." According to Kemp, he remembered that the gun was in the console, "[a]nd it was in my mind, 'I don't think it's a good idea for me to return the gun back.'" Kemp took the gun out of the console and put it in his left front pocket. He was pulled over soon thereafter for suspected drunk driving, and told the arresting officer that he possessed the gun.

*Why* Kemp possessed the gun was disputed at trial. The arresting officer testified that Kemp gave him two different explanations. Kemp initially told the officer that he needed the gun to protect himself from "crackheads" who frequented an automotive repair shop that he owned. At the police station, however, Kemp signed a written statement that read:

> Cheryl Pigg felt like her life was in danger because her ex-husband had made threats to kill her. We was walking around [the] store and she bought [a] .32 derringer. It's her gun, not mine. Registered in her name, Cheryl Pigg. She asked me to hold on to [the] handgun, and I put in my pocket.

Kemp offered yet another explanation at trial. He testified that, had he returned the gun to Pigg:

> In her condition, most anything could have happened. The way she was feeling, she could have killed herself with the gun. And the emotional state she was in, the emotions she was going through at that time, she could have killed herself. She could have killed me. She could have let the gun go off and shot an innocent by-stander because the gun had never been fired. She didn't even know how to operate the gun.

Kemp further testified that he "just decided it would be best not to give the gun back to her, to put it in my pocket until we got back to the house and she sobered up."

The government sought to impeach the credibility of Kemp's testimony with evidence of his prior convictions. The government had already read to the jury a stipulation that "at all times relevant to the charges in this case . . . Kemp had previously been convicted of a felony, that is, a crime punishable by a term of imprisonment exceeding one year[.]" Now the government sought to tell the jury the names and dates of the convictions—namely, that Kemp had been twice convicted in 1987 of taking indecent liberties with a minor. The district court allowed the impeachment. Accordingly, during cross-examination, the government asked Kemp if he had been "convicted . . . and sentenced to ten years for taking indecent liberties with a minor[.]" Kemp admitted that he had. The government did not inquire any further into the nature of the offenses.

At the close of trial, the court instructed the jury that:

[Y]ou have heard the testimony that defendant was previously convicted of a crime punishable by more than one year in prison. This prior conviction was put into evidence for you to consider in evaluating the witness's credibility. You may consider the fact that the witness who testified is a convicted felon in deciding how much of his testimony to accept and what weight, if any, it should be given.

Kemp requested an additional instruction on his justification defense, arguing that he possessed the firearm "to protect Ms. Pigg and himself." The district court denied the request. Thereafter, the jury convicted Kemp of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

This appeal followed.

II.

A.

Kemp argues that the district court erred in allowing the government to cross-examine him regarding his prior convictions for taking indecent liberties with a minor. This argument rests on Kemp's contention that the prejudicial effect of those prior convictions exceeded their probative value at trial. But Kemp did not make that contention to the district court. Our review of this issue, therefore, is limited to determining whether the district court committed plain error. *See United States v. Oliver*, 397 F.3d 369, 375 (6th Cir. 2005).

A defendant's prior conviction for "a crime punishable by imprisonment for a term exceeding one year" is an element of a felon-in-possession charge. 18 U.S.C. § 922(g)(1). Evidence of a defendant's predicate conviction is therefore relevant in a felon-in-possession case. *See Old Chief*, 519 U.S. at 186. Under Federal Rule of Evidence 403, however, in cases where the defendant stipulates to his status as a felon for purposes of § 922(g)(1), the government may not refer to the specific name or nature of the defendant's prior convictions in its case-in-chief. *See Old Chief*, 519 U.S. at 186-87.

But this protection can recede when a criminal defendant chooses to testify at trial. In that event, it is possible, though not certain, that the defendant can "be cross-examined about his prior convictions for the limited purpose of impeaching his testimony." *United States v. Perry*, 512 F.2d 805, 806 (6th Cir. 1975). Whether the defendant can be so impeached is governed by Federal Rule of Evidence 609(a)(1), which provides: "For the purpose of attacking the character for truthfulness of a witness . . . evidence that an accused has been convicted of [a felony] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused."

The district court so determined here with respect to Kemp's indecent-liberties convictions. The court reasoned that "these are felonies which triggered the convicted felon status, that they are close enough in time that their prejudicial effect does not outweigh the probative value. And while it's certainly prejudicial, it's my judgment that the probative value of these felonies outweighs their prejudicial effect."

We have our doubts about that finding. The mere fact that the indecent-liberties convictions "triggered [Kemp's] convicted felon status" adds little to their impeachment value. Moreover, in *every* felon-in-possession case there is a prior conviction that "triggers" the defendant's status. To admit evidence of the conviction on that ground, therefore, would render *Old Chief* meaningless in every such case where the defendant chooses to testify. We do not think the Supreme Court intended that result.

Nor does the "tim[ing]" of Kemp's prior convictions tip the balance in favor of their probative value. It is undisputed that the convictions fell within the time limit specified in Rule 609(b). But that merely allows the district court to *conduct* the balancing of probative value and prejudicial effect specified in Rule 609(a)(1); it does not mean that the balancing, once conducted, actually favors admission. The requirements of the two provisions are distinct; and that the time limit of Rule 609(b) is met should not mean, perforce, that the balancing requirement of Rule 609(a)(1) is met as well.

We are thus left to ask what impeachment value, exactly, was gained by having the jury know not only that Kemp was a felon *simpliciter*—which they already knew—but that he was this particular *kind* of felon. On this record we can see little or no such value at all. The district court's reasoning points to none in particular, and the government points to none. Moreover, the prejudicial effect of the convictions' names was significant. "[T]here can be no question that evidence of the name or nature of the prior offense generally carries a risk of unfair prejudice to the defendant." *Old Chief*, 519 U.S. at 185. And in this case the names of those convictions—involving as they do sexual contact with minors—were heavy with prejudice. The risk was that the jury would convict Kemp, not on the merits of *this* case, but on the merits of his past ones.

But these concerns were not presented to the district court in this case. To the contrary, Kemp's counsel stated that "the only real objection I have" to the admission of this evidence was "the age" of the convictions. Thus, to some extent, the limitations of this record may reflect the fact that Kemp did not argue below that the convictions' prejudicial effect exceeded their probative value. Had he so argued, the district court might have developed a more detailed record in support of its ruling. Moreover, it is undisputed that Kemp's credibility was central to his trial, thus enhancing the importance of impeachment evidence generally. *See United States v. Moore*, 917 F.2d 215, 234-35 (6th Cir. 1990) (citing *United States v. Gordon*, 383 F.2d 936, 940 (D.C.Cir. 1967)).

The better practice would have been for the district court to explain why, specifically, the impeachment value of the names of Kemp's convictions exceeded their prejudicial effect. But our standard of review here is exceedingly deferential. And we cannot conclude that the district court's admission of those names was so manifestly incorrect as to amount to plain error.

B.

Kemp has otherwise painted himself into a corner in this case. He stipulated to his status as a felon, admitted possessing the firearm, and did not dispute that it had traveled in interstate commerce. Which is to say, he essentially admitted committing the crime with which he was charged. His only hope at trial lay—and now on appeal lies—with his putative justification defense.

A justification defense "allows a defendant to escape responsibility despite proof that his actions encompassed all the elements of a criminal offense." *United States v. Ridner*, 512 F.3d 846, 849 (6th Cir. 2008). The defense arises only in "rare situations" and "should be construed very narrowly." *United States v. Singleton*, 902 F.2d 471, 472 (6th Cir. 1990).

To be entitled to an instruction on the defense, a defendant must make a *prima facie* showing as to each of the following five *Singleton* factors:

> (1) that defendant was under an *unlawful and present, imminent, and impending threat* of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;

> (2) that defendant *had not recklessly or negligently placed himself in a situation* in which it was probable that he would be forced to choose the criminal conduct;

(3) that defendant had *no reasonable, legal alternative to violating the law*, a chance both to refuse to do the criminal act and also to avoid the threatened harm;

(4) that a *direct causal relationship* may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm; . . . and

(5) [that the defendant] did not *maintain the illegal conduct any longer than absolutely necessary*.

*Ridner*, 512 F.3d at 850 (emphasis added; ellipses in original).

The defendant's initial burden in establishing these elements "is not a heavy one, and is met even where there is weak supporting evidence" for the defense. *Id.* at 849. But a jury instruction on justification "'should not be given if [the defense] lacks evidentiary support or is based upon mere suspicion or speculation[.]'" *United States v. Newcomb*, 6 F.3d 1129, 1132 (6th Cir. 1993) (quoting *United States v. James*, 819 F.2d 674, 675 (6th Cir. 1987)). A district court "is certainly not required to instruct the jury on a defense the theory of which is not even supported by the testimony of the defendant adduced at trial." *United States v. Plummer*, 789 F.2d 435, 438 (6th Cir. 1986). A justification instruction is proper, therefore, only "if the defendant produces evidence upon which a reasonable jury could conclude by a preponderance of the evidence that each of the" *Singleton* factors is met. *Ridner*, 512 F.3d at 850.

Kemp failed to do that for at least four of the five *Singleton* factors. First, he produced no evidence that he was under an imminent and impending threat of death or serious bodily injury when he took the gun. No such threat existed when Kemp took the gun out of his truck's console and put it in his pocket. Pigg had not reached for the gun, or threatened him with it, or even acknowledged it since leaving the hospital. Kemp's own speculation about Pigg's "emotional state" and ability to handle the gun does not remotely support a finding of imminent threat. Nor does his testimony that Pigg was intoxicated and "just giggling and carrying on[,]" and that he "just decided it would be best not to give the gun back to her, to put in my pocket until we got back to the house and she sobered up." A felon is not free to take possession of a firearm merely because its owner is drunk.

Second, Kemp's testimony demonstrates that he recklessly put himself in the situation upon which he now relies. Indeed, he helped create it. Kemp recommended that Pigg obtain the gun. He knew she had the gun in her purse when she got in the truck with him. And he knew that she was bringing a six-pack of "strawberry daiquiris" with her, and that she would drink them on the trip to Tennessee.

Third, the "keystone of the analysis is that the defendant must have *no alternative*—either before or during the event—to avoid violating the law." *Singleton*, 902 F.2d at 473 (emphasis added). Kemp had plenty of alternatives here. If he thought Pigg was too intoxicated to be trusted near her gun, he could have alerted the police, or remained in the hospital until she sobered up, among other things. Instead, he chose to commit a new felony.

Finally—even under Kemp's view of the exigencies that night—he possessed the gun much longer than necessary. Simply stated, Kemp "should have called the police" upon taking possession of the gun. *Singleton*, 902 F.2d at 473. Instead, he kept it in his pocket until the police stopped his vehicle and took the gun away.

The district court was correct, therefore, in refusing to give a justification instruction. No reasonable jury could have found that all of the elements of the defense—or even more than one of them—were met in this case.

III.

For the foregoing reasons, we affirm the judgment of the district court.